IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| WILLIE DAVIS (#A-015810) | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 13-cv-4670 |
| | ) | |
| v. | ) | Honorable Robert M. Dow, Jr. |
| | ) | |
| PARTHASARATHI GHOSH, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Willie Davis, an Illinois state prisoner, has brought this *pro se* civil rights action pursuant to 42 U.S.C. § 1983. Plaintiff claims that Defendant Parthasarathi Ghosh, a physician at the Stateville Correctional Center, violated his constitutional rights by acting with deliberate indifference to his serious medical needs. More specifically, Plaintiff alleges that Dr. Ghosh denied him needed care and treatment for severe headaches and high blood pressure despite MRI results that should have alerted Dr. Ghosh as to the likely cause of Plaintiff's symptoms.

Before the Court is Defendant Dr. Ghosh's motion for summary judgment [41] pursuant to Federal Rule of Civil Procedure 56(a). For the following reasons, the motion is granted.

**I.    Background**

Plaintiff is an inmate in the custody of the Illinois Department of Corrections ("IDOC"). [43, ¶ 1.] He has been incarcerated at the Stateville Correctional Center at all times relevant to this action. [43, ¶ 1.] Defendant Dr. Parthasarathi Ghosh was Stateville's medical director from 2006 through March 31, 2011, when he retired. [43, ¶ 6.]

Beginning in September 2010, Plaintiff began suffering from headaches and blurred vision, and he experienced difficulty balancing while walking. [43, ¶ 8.] He also noticed some kind

of "distortion" in his face. [43, ¶ 8.] On September 23, 2010, Plaintiff sought medical attention in Stateville's Health Care Unit. [43, ¶ 7.] A nurse took Plaintiff's vital signs, which reflected that he had an elevated blood pressure of 192/118. [43, ¶ 9.] The health care staff notified Dr. Ghosh, who admitted Plaintiff into the infirmary for 23-hour observation. [43, ¶ 9.] The progress notes from that day indicate that nurses administered Clonidine (a blood pressure medication[1]) to Plaintiff and checked his blood pressure every three hours. [43, ¶ 10.]

The next day, Plaintiff rested in bed, and a nurse recorded his vital signs. [43, ¶ 11.] After the nurse finished with Plaintiff, Dr. Ghosh examined him, conducting a "hands-on" physical examination. [43, ¶¶ 12–14.] Dr. Ghosh said to Plaintiff, in Plaintiff's words, "You're not having a stroke. You done had a stroke." [43-3, at 9.] Dr. Ghosh explained to Plaintiff that his headaches were a symptom of the stroke. [43-3, at 10.] Plaintiff was not "in distress" at the time of his physical examination; Plaintiff had coherent speech and was ambulatory. [43, ¶¶ 17–18.]

After completing the examination, Dr. Ghosh directed the nurse to provide Plaintiff with blood pressure medication. [43, ¶¶ 13–14.] Dr. Ghosh prescribed Plaintiff Atenolol (a medication used to combat hypertension and other cardiovascular diseases), enteric-coated aspirin (a blood thinner), Vasotec (an angiotensin-converting-enzyme inhibitor also used in the treatment of high blood pressure), and HCTZ (an acronym for hydrochlorothiazide, a diuretic medication used to treat high blood pressure as well as swelling due to fluid buildup). [43, ¶ 15.] Dr. Ghosh also prescribed Plaintiff Motrin to relieve his headaches, and ordered an MRI of Plaintiff's brain. [43, ¶¶ 7, 16.] Dr. Ghosh kept Plaintiff in the infirmary for several more days to monitor his progress.

---

[1] The Court gleans the essential purpose of the various medications mentioned in the Statement of Facts from the PHYSICIAN'S DESK REFERENCE, 59th ed.

Dr. Ghosh checked on Plaintiff every day while he was in the infirmary, as did the nurses. [43, ¶ 22.] On September 25, 2010, Plaintiff reported that he was still suffering from double vision, but he had no other complaints. [43, ¶ 19.] On September 26, Plaintiff was in "no distress" when his vitals were again taken. [43, ¶ 20.] On September 27, Dr. Ghosh wrote in Plaintiff's progress notes that the patient was feeling better, no longer felt dizzy, and that his double vision was improving. [43, ¶ 21.] Dr. Ghosh's progress notes reflected that Plaintiff was coherent and that he felt much better. [43, ¶ 24.] Dr. Ghosh discharged Plaintiff from the infirmary later that day. [43, ¶ 24.] In the ensuing days, Plaintiff's headaches diminished, his equilibrium improved, and his vision recovered somewhat. [43, ¶ 23.]

On October 6, 2010, Plaintiff went to Provena Hospital for an MRI of his brain. [43, ¶ 26.] Dr. Ghosh met with Plaintiff later that day and informed him that it would take two days to get the results of the MRI, and he advised Plaintiff that he would notify him if any issues arose. [43, ¶ 28.] The MRI report, drafted by Provena physician John S. Groch, M.D., read as follows:

> No discrete soft tissue intensity intracranial mass lesion, shift of midline structures or suspicious areas of enhancement are identified on the study. There is a mild to moderate amount of increased T2-FLAIR weighted signal noted in the white matter bilaterally extending from the periventricular subcortical regions. This most likely represents white matter ischemic change. No acute infarcts are noted on diffusion imaging. Minimal cerebral atrophy is present. At most minimal amount of mucosal thickening is noted in a few scattered paranasal sinuses.
>
> Impression:
>
> Mild to moderate amount of white matter ischemic change is noted bilaterally. No acute infarcts are noted on diffusion imaging. Mild cerebral atrophy.

[43, ¶ 26.] Plaintiff never saw Dr. Ghosh after October 6, 2010. [43, ¶ 27.]

Following his MRI, Plaintiff was assigned to the hypertension clinic, which he visited every 90 days. [43, ¶ 29–30.] At each visit, Plaintiff's blood was drawn, then a doctor examined

3

him and reviewed his lab reports and blood tests. [43, ¶ 30.] The physicians adjusted Plaintiff's medications accordingly. [43, ¶ 30.] Between October 2010 and July 2011, Plaintiff received a number of prescription and non-prescription medications to address his hypertension and other medical issues, including Atenolol, HCTZ, Vasotec, Enalpril, and aspirin (*i.e.*, a drug regime similar to that of what Dr. Ghosh prescribed originally). [43, ¶ 31.]

On April 25, 2011, Plaintiff saw Dr. Schaeffer at the hypertension clinic, and she noted "Good Control" in Plaintiff's medical records and continued the same basic medication regimen that Dr. Ghosh had prescribed: Atenolol, Vasotec, and HCTZ. [43, ¶ 33.] Then on July 17, 2011, Plaintiff saw Dr. Schaeffer again. According to Plaintiff, Dr. Schaeffer had recently come across Plaintiff's 2010 MRI report, and she told Plaintiff that he had a "clogged vein" and that he should have been on medication to treat that issue since the time of the MRI (*i.e.*, since October 2010). [43, ¶ 36; 43-4.] Dr. Schaeffer declared that something other than hypertension had to be wrong because Plaintiff was still experiencing headaches, blurred vision, and unsteadiness even after his blood pressure went down. [43-2, at 12.] Dr. Schaeffer's progress notes of July 17, 2011 reflect that she continued Plaintiff's ongoing treatments of aspirin, Vasotec, Atenolol, and HCTZ, but added a blood thinner called Plavix to Plaintiff's drug therapy. [43, ¶ 37; 47, ¶ 26.] While Plaintiff was on Plavix, the medication did not alleviate his headaches or imbalance. [43, ¶ 40.] Doctors discontinued Plaintiff's prescription of Plavix in November 2012 because it caused bleeding under his nails, bruising, and nosebleeds. [43, ¶¶ 38–39.]

On September 11, 2011, Plaintiff filed a grievance based on Dr. Schaeffer's July 17, 2011 diagnosis, complaining that Dr. Ghosh's failure to treat his "clogged vein" caused him irreparable injury. [43-4, at 2–3.] The grievance counselor "received" the grievance on September 20, 2011, and informed Plaintiff that a response was forthcoming. [43-4, at 2–3.] The parties did not provide

4

any information regarding the grievance officer's response, but on September 28, 2012 the grievance was submitted (presumably by Plaintiff) to the Administrative Review Board. [43-5, at 2.] The Board rejected the appeal as untimely, noting that the grievance officer received the grievance more than 60 days after the incident giving rise to the claim. [43-5, at 2.]

## II. Legal Standard

### A. Northern District of Illinois Local Rule 56.1

Because Plaintiff is a *pro se* litigant, Defendant served him with a "Notice to Pro Se Litigant Opposing Motion for Summary Judgment," as required by Local Rule 56.2. [See 44.] The notice explained in detail the consequences of failing to respond properly to a motion for summary judgment and statement of material facts under Federal Rule of Civil Procedure 56 and Local Rule 56.1.

Local Rule 56.1(a)(3) requires a party moving for summary judgment to submit "a statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to judgment as a matter of law." *Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 632 (7th Cir. 2009) (citing L.R. 56.1(a)(3)). Per Local Rule 56.1(b)(3), the nonmoving party then must submit a "concise response" to each statement of fact, "including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon." L.R. 56.1(b)(3)(B). The nonmoving party may also present a separate statement of additional facts that requires the denial of summary judgment. L.R. 56.1(b)(3)(C); see also *Ciomber v. Cooperative Plus, Inc.*, 527 F.3d 635, 643–44 (7th Cir. 2008).

"When a responding party's statement fails to dispute the facts set forth in the moving party's statement in the manner dictated by [Local Rule 56.1], those facts are deemed admitted for purposes of the [summary judgment] motion." *Cracco*, 559 F.3d at 632. Thus, district courts

5

disregard Local Rule 56.1 responses that do not cite specific portions of the record or that contain irrelevant information, legal arguments, conjecture, or evasive denials. See *id.*; see also *Cady v. Sheahan*, 467 F.3d 1057, 1060 (7th Cir. 2006); *Bordelon v. Chi. Reform Bd. of Trs.*, 233 F.3d 524, 528 (7th Cir. 2000). A plaintiff's *pro se* status does not excuse him from complying with federal and local procedural rules. See *McNeil v. United States*, 508 U.S. 106, 113 (1993).

Here, Plaintiff is no stranger to *pro se* litigation, having previously filed at least one prior habeas corpus action and one civil rights action in this district. See *Davis v. DeTella*, No. 96-cv-8311; *Davis v. Clark*, No. 98-cv-6291. Nevertheless, given Plaintiff's *pro se* status, the Court will construe his filings liberally. See *Ambrose v. Roeckeman*, 749 F.3d 615, 618 (7th Cir. 2014). However, the Court will consider the factual assertions Plaintiff makes in his opposing brief only to the extent that he could properly testify about the matters asserted at trial. Affidavits must concern facts about which the affiant is competent to testify, must be based on personal knowledge, and must set forth such facts as would be admissible in evidence. Fed. R. Civ. P. 56(e); Fed. R. Evid. 602. Additionally, the validity of medical records and entries in the medical records cannot be disputed in the absence of any contrary evidence. *Richmond v. Dart*, 2012 WL 6138751, at *1 (N.D. Ill. Dec. 11, 2012); *Johnson v. Hart*, 2011 WL 5509546, at *2 (N.D. Ill. Nov. 8, 2011). Furthermore, a layperson may not testify about matters involving medical, technical, or other specialized knowledge. See Fed. R. Evid. 701, 702.

### B.     Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 248 (1986). At the summary judgment stage, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 255 (quotation omitted).

## III. Analysis

### A. Exhaustion

Defendant argues that Plaintiff failed to exhaust his administrative remedies. In order to give corrections officials an opportunity to address complaints internally before a federal lawsuit is initiated, the Prison Litigation Reform Act requires that prisoners must exhaust their administrative remedies before filing a lawsuit. 42 U.S.C. § 1997(e)(a); *Porter v. Nussle*, 534 U.S. 516, 524–25 (2002). This means that an inmate "must file complaints and appeals in the place, and at the time, the prison's administrative rules require." *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002).

Defendant's only argument is that Plaintiff failed to file a grievance within 60 days after discovery of the incident giving rise to his claim against Dr. Ghosh, as required by 20 Ill. Admin. Code § 504.810(a) (also known as "Department Rule 504"). See *Roberts v. Neal*, 745 F.3d 232, 235 (7th Cir. 2014). The parties agree that the relevant incident date is July 17, 2011, when Dr. Schaeffer allegedly told Plaintiff that he had a "clogged vein," leading him to surmise that Dr. Ghosh either overlooked or misread his MRI report. Plaintiff filed a grievance reporting this issue on September 11, 2011—*i.e.*, before the 60-day limit. [See 43-4.] However, the grievance

7

counselor "received" the grievance on September 20, 2011—*i.e.*, after the 60-day limit. Defendant does not argue that Plaintiff falsified the date of his grievance.

Viewing the facts in the light most favorable to Plaintiff, it appears that the only reason that the grievance was untimely is because it took the prison nine days to receive to it. But the 60-day clock stops when the inmate *files* the grievance, not when the counselor *receives* it. Plaintiff filed his grievance within 60 days of the incident giving rise to his claim, and thus he properly exhausted administrative remedies.[2]

### B. Deliberate Indifference

Correctional officials and health care providers may not act with deliberate indifference to an inmate's serious medical needs. See, *e.g.*, *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Pittman ex rel. Hamilton v. Cnty. of Madison, Ill.*, 746 F.3d 766, 775 (7th Cir. 2014). Deliberate indifference has both an objective and a subjective element: the inmate must have an objectively serious medical condition, and the defendant must be subjectively aware of and consciously disregard the inmate's medical need. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

#### 1. The Objective Element

A medical need is objectively serious when "the inmate's condition has been diagnosed by a physician as mandating treatment or is so obvious that even a lay person would perceive the need for a doctor's attention." *Gomez v. Randle*, 680 F.3d 859, 865 (7th Cir. 2012) (quoting *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011)). Dr. Ghosh does not dispute that high blood pressure constitutes a potentially serious medical condition. See, *e.g.*, *Jackson v. Pollion*, 733 F.3d 786, 789 (7th Cir. 2013) ("Hypertension is a serious condition. Untreated it can result in strokes or heart

---

[2] Because exhaustion is apparent, a *Pavey* hearing is not required. *Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015) (citing *Pavey v. Conley*, 544 F.3d 739, 742 (7th Cir. 2008)).

attacks.") Whether or not Plaintiff suffered a stroke or heart attack in September 2010, his elevated blood pressure, combined with the symptoms he was experiencing, evince an objectively serious medical condition. Plaintiff's medical condition satisfies the objective prong.

## 2. The Subjective Element

With respect to the subjective component of the deliberate indifference test, a plaintiff must show that the defendant in question was aware of and consciously disregarded his medical need. See *Farmer*, 511 U.S. at 837; *Estelle*, 429 U.S. at 103–04. "This subjective standard requires more than negligence and it approaches intentional wrongdoing." *Holloway v. Del. Cnty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012) see also *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012) ("Negligence—even gross negligence—is insufficient to meet this standard, but the plaintiff is not required to show intentional harm."); *Farmer*, 511 U.S. at 837 (comparing deliberate indifference to criminal recklessness).

More specific to the medical context, "[d]eliberate indifference is not medical malpractice," and it does not encompass a mere disagreement with a doctor's medical judgment. *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011); *Holloway*, 700 F.3d at 1073. It encompasses conduct such as the refusal of effective treatment, see *Fields v. Smith*, 653 F.3d 550, 556 (7th Cir. 2011), or erroneous treatment based on a substantial departure from accepted medical judgment, practice, or standards. *Roe*, 631 F.3d at 857. Prisoners are entitled to "adequate medical care," not "unqualified access to healthcare." *Holloway*, 700 F.3d at 1073. Medical professionals may choose from "a range of acceptable courses based on prevailing standards in the field." *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008). Only treatment decisions that are "'such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment" can support a finding of

9

deliberate indifference. *Holloway*, 700 F.3d at 1073 (quoting *Sain v. Wood*, 512 F.3d 886, 895 (7th Cir. 2008)). In weighing deliberate indifference claims, the Court examines the totality of the medical care provided. See *Walker v. Peters*, 233 F.3d 494, 501 (7th Cir. 2000).

Here, Plaintiff overstates his case by claiming that Dr. Ghosh failed to treat his high blood pressure or headaches. When Plaintiff voiced his health complaints, Dr. Ghosh immediately admitted him to the infirmary for observation, prescribed a number of medications to address his high blood pressure and associated symptoms, and ordered an MRI. While Plaintiff claims that his headaches and vision problems persisted throughout his treatment, he nonetheless concedes that Dr. Ghosh (or physicians under Dr. Ghosh's control) continually treated him, and that his symptoms steadily improved under Dr. Ghosh's treatment regimen. Dr. Ghosh's inability to remedy all of Plaintiff's symptoms does not support a finding of deliberate indifference. See, *e.g.*, *Dobbey v. Zhang*, 2013 WL 4838916, at *8 (N.D. Ill. Sep. 10, 2013); *Glass v. Rodriquez*, 417 F. Supp. 2d 943, 948 (N.D. Ill. 2006) ("Where, as here, a physician provides constitutionally acceptable care, his or her inability to effect a final cure is not proof of deliberate indifference." (citing *Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1996))); *Merritt v. Ghosh*, 2009 WL 2386272, at *7 (N.D. Ill. July 29, 2009) (same).

Nor has Plaintiff identified any evidence demonstrating that Dr. Ghosh's medical treatment was a substantial departure from accepted professional standards. See *Holloway*, 700 F.3d at 1073. To the contrary, the physicians who treated Plaintiff after Dr. Ghosh's retirement followed nearly identical treatment plans as Dr. Ghosh (with the exception of Dr. Schaeffer, who added Plavix to Plaintiff's treatment regime). Plaintiff cannot claim that Dr. Ghosh's treatment was a substantial departure from professional standards when other physicians followed an identical, or nearly identical, plan.

Instead, Plaintiff relies heavily on Dr. Schaeffer's alleged comment (which is inadmissible hearsay[3]) to Plaintiff that Dr. Ghosh must have misread (or not read) the MRI report, arguing that Dr. Schaeffer's decision to add Plavix to Plaintiff's treatment regimen demonstrates Dr. Ghosh's deliberate indifference. The Court disagrees.

First, there is no evidence that Dr. Ghosh failed to review Plaintiff's MRI report, and even if he had, that would not equate to a finding of deliberate indifference here. Dr. Ghosh met with Plaintiff after his MRI (but before the results were in), and he told Plaintiff that he would contact him "if anything was found." [43, ¶ 28.] After Plaintiff received his MRI, he was assigned to the hypertension clinic where he continued to receive comprehensive care for his medical condition. Thus, even if the Court were to credit Plaintiff's allegation (based on a hearsay statement from Dr. Schaeffer) and assume that Dr. Ghosh failed to review the MRI report, that does not change the fact that Plaintiff still received adequate medical care. In short, regardless of whether Dr. Ghosh reviewed the MRI report, there is no indication that Dr. Ghosh's treatment regimen was "'so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate' [Plaintiff's] condition." *Greeno v. Daley*, 414 F.3d 645, 654 (7th Cir. 2005) (quoting *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996)).

Second, assuming that Dr. Ghosh's failure was a misreading of the MRI report, it is unclear what aspect of the report Plaintiff contends Dr. Ghosh misread. To be clear, specialist physician John S. Groch, M.D. conducted and interpreted the MRI, and provided Dr. Ghosh with a one-page report of his findings. [See 43-3, at 25.] Dr. Groch reported no acute infarcts (*i.e.*, dead tissue,

---

[3] "A party may not rely upon inadmissible hearsay to oppose a motion for summary judgment." *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). While Plaintiff relies a great deal on Dr. Schaeffer's inadmissible hearsay statements, because he is proceeding *pro se*, the Court will nonetheless review the merits of Plaintiff's arguments.

DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, 28th ed., at 837), as would suggest a stroke or heart attack. Dr. Groch also noted mild to moderate ischemic change (*i.e.*, constriction or obstruction of blood vessels, *id.*, at 861) and mild cerebral atrophy. Plaintiff provides no explanation as to how Dr. Schaeffer purportedly gleaned from the MRI report that Plaintiff had a hitherto undetected and untreated "clogged vein," nor does Plaintiff explain how Dr. Ghosh's treatment regimen failed to treat such a condition. The only evidence to this point is the fact that Dr. Schaeffer added Plavix to Plaintiff's prescription-drug regime, but (a) Plavix is a blood thinner, and is thus not categorically different from the drugs that Dr. Ghosh prescribed to Plaintiff, and (b) Plavix did not alleviate Plaintiff's remaining symptoms. There is no evidentiary basis for deducing that Dr. Ghosh misread or failed to notice any information on the MRI report, or that his prescribed treatment regimen was inadequate or inappropriate in any way.

Third, regarding Dr. Schaeffer's alleged comment that Plaintiff should have been on Plavix sooner, there is no evidence that Plavix was a necessary component to Plaintiff's treatment regimen, or that Dr. Ghosh was deliberately indifferent in failing to prescribe it. Dr. Ghosh prescribed Plaintiff with a number of blood pressure-related medications, including Atenolol, aspirin, Vasotec, and HCTZ, as well as Motrin to treat his headaches. Plaintiff provides no evidence for finding that Dr. Ghosh should have included Plavix in Plaintiff's treatment regimen, either before or after his MRI. See, *e.g.*, *McCaskill v. Manilla*, 2014 WL 7476232, at *4–5 (N.D. Ill. Dec. 30, 2014) (granting summary judgment for defendants where the plaintiff claimed he did not receive either "the full complement" or same dosage of hypertension medications he had been prescribed prior to his incarceration). To the contrary, Plaintiff testified that Plavix (as prescribed by Dr. Schaeffer) did not lessen his headaches or improve his balance, and he eventually stopped

taking Plavix in November 2012 because it caused bleeding under his fingernails, bruising, and nosebleeds.

It is unfortunate that Plaintiff's medical treatment (from his many treating physicians) has failed to rid him of his symptoms entirely. However, Dr. Ghosh clearly provided Plaintiff with immediate, extensive, and continuing treatment, including personal examinations, patient monitoring, a prescription-drug regimen, and consultations from outside specialists (including an MRI). There is no indication that Dr. Ghosh failed to adequately treat Plaintiff's medical condition, that Dr. Ghosh deviated from acceptable professional standards, or that Dr. Ghosh disregarded a substantial risk of harm to Plaintiff. Accordingly, Plaintiff has no triable claim against Dr. Ghosh.

## IV. Conclusion

For the foregoing reasons, Defendant's motion for summary judgment [41] is granted. The Court directs the Clerk to enter final judgment pursuant to Federal Rule of Civil Procedure 58.

If Plaintiff wishes to appeal, he may file a notice of appeal with this Court within 30 days of the entry of judgment. Fed. R. App. P. 4(a)(4). A motion for leave to proceed *in forma pauperis* on appeal should set forth the issues Plaintiff plans to present on appeal. See Fed. R. App. P. 24(a)(1)(C). If Plaintiff chooses to appeal, he will be liable for the $505 appellate filing fee irrespective of the outcome of the appeal. See, *e.g.*, *Hoskins v. Dart*, 633 F.3d 541, 544 (7th Cir. 2011). Furthermore, if the appeal is found to be non-meritorious, Plaintiff may also be assessed a "strike" under 28 U.S.C. § 1915(g). Plaintiff is advised that if a prisoner has had a total of three federal cases or appeals dismissed as frivolous, malicious, or failing to state a claim, he may not file suit in federal court without prepaying the filing fee unless he is in imminent danger of serious physical injury.

Dated: May 26, 2015

_____
Robert M. Dow, Jr.
United States District Judge